[No. 28049.  *En Banc.*  December 5, 1940.]

THE STATE OF WASHINGTON, *on the Relation of Edward A. Dunn, Appellant,* v. HENRY ELLIOTT, JR., *et al., Respondents.*[1]

[1]Reported in 107 P. (2d) 915.

*Geo. H. Crandell,* for appellant.

*A. C. Van Soelen* and *John E. Sanders,* for respondents.

*Joseph A. Sweeney* and *B. H. Camperson, amici curiae.*

STEINERT, J.—The relator, Edward A. Dunn, petitioned for a writ of mandate directing defendants, the civil service commissioners of the city of Seattle, to place him in position No. 2 on the existing eligible list for appointment to the office of police captain; to certify his name, under that number, to the chief of police of the city; and, further, to direct the chief of police to give relator the position of captain in lieu of any person holding a lower grade who might since have been appointed to that position. After a hearing by the court, judgment was entered dismissing the action. From that judgment, relator has appealed.

Appellant relator is a sergeant in the police department of the city of Seattle. On April 10, 1939, a civil service examination for promotion from police sergeant to police captain was held. Appellant, together

with eighteen others holding the position of police sergeant, took the examination and received a passing grade.

At the beginning of the examination, each competitor was given a one-page instruction sheet, upon which appeared, among other directions and information, the following:

"The *written* part of the examination is given at this time. Those candidates who qualify on these *written* tests will be called for a working test and *oral interview* at a later date. (Italics thus far supplied.) . . . A minimum *final* grade of 75% is required for entry on the eligible list for certification, as well as the passing of a satisfactory medical test."

In order to conceal the identity of those participating in the written examination, the papers were identified by number rather than by name.

On May 24, 1939, the civil service commissioners approved the results of the preliminary, or written, examination, which showed that, of the nineteen participants, eighteen had qualified in the written test. At the same time, the commissioners ordered that the papers be identified, and that the tests be completed.

The applicants who had passed the written examination were later called for oral examination, which was held August 4, 1939. The board of examiners consisted of the secretary and chief examiner of the civil service commission, an engineer examiner in the civil service department, a retired police captain, and a private citizen who was a personnel officer of a public utility corporation. Each examiner was provided with a mimeographed instruction sheet. We quote the opening paragraph therefrom to illustrate the nature of the instructions as well as the purpose of the oral examination:

"You are to rate the candidate on certain characteristics which have a bearing on the likelihood that he will

be successful in the position for which he is an applicant, but which are not measured by a rating of his experience and training, nor by his performance in a written examination, but which can be observed when you talk with him face to face."

In addition, each examiner was given rating forms to be used by him during the oral examination. Each form listed the following characteristics, as to which the applicants were to be judged: voice and speech; appearance; alertness; ability to present ideas; judgment; emotional stability; confidence; friendliness; and personal fitness for the position. Under each characteristic thus specified, and along a horizontal grading line, appeared certain data which served as a scale, and according to which each examiner was required to indicate the candidate's rating as to the particular characteristic, by placing a check mark at the appropriate point on the line. For instance, underneath the characteristic designated "voice and speech" appeared the following descriptive matter printed below and along the grading line, at points as indicated in the brackets:

"Irritating or indistinct [extreme left of the line]; understandable but rather unpleasant [second from left]; neither conspicuously pleasant nor unpleasant [center of the line]; definitely pleasant and distinct [second from right]; exceptionally clear and pleasing [extreme right of line]."

The further to the right that the check mark was placed, the higher was the grade of the applicant upon the particular characteristic.

On the day set for the oral examination, August 4, 1939, the applicants who had been successful in the written examination appeared at the appointed place and were there privately interviewed, one at a time, by the board of examiners, the interview with each applicant lasting about ten minutes. During the in-

terview with each particular applicant, each member of the examining board placed upon the rating form held by him check marks at appropriate places on the grading line to indicate his estimate of the applicant's various characteristics. All the interviews were completed on the same day.

Later that day, the chief examiner and an assistant converted the check marks on the rating forms into percentages, and the results reached by the four examiners were averaged into one final grade on the oral examination. The results of the written and oral examinations were then combined, a weight of seventy-five per cent being assigned to the results of the written examination, and a weight of twenty-five per cent to the results of the oral examination. The following day, August 5, 1939, the final examination results were approved by the civil service commission, and by letter dated August 8, 1939, appellant was notified that his final grade was 88.014%, which gave him a relative standing of No. 6, subject to the result of the required medical examination.

On August 10, 1939, appellant addressed a communication to the civil service commission requesting that he be re-examined by a different interviewing board, on the ground that one of the oral examiners was prejudiced against him. A hearing on that matter was given appellant on August 16, 1939, and subsequently his request was denied. The correctness of that ruling, however, is not involved here. We mention the matter at this time only because of the reference which we shall make to it later.

On August 23, 1939, the civil service commission, acting upon a number of protests which had previously been filed by various applicants, determined that, in the written examination, *six* questions had been graded incorrectly, and that two additional questions were

controversially worded and should therefore be eliminated from consideration. The papers of all the applicants were regraded in accordance with that order, and under date of September 6, 1939, a mimeographed explanatory letter was sent to each competitor, informing him of the action taken and setting forth in full the questions involved, followed by the answers previously considered correct, and then by the correct answers as finally determined. The two questions eliminated from consideration because of their controversial nature were likewise quoted in the letter. The communication concluded with the applicant's corrected grade and relative standing. In appellant's case, the corrections resulted in a final grade of 86.964%, and a relative standing of No. 8. His previous grade, it will be recalled, was 88.014%, and his original standing, No. 6.

On September 11, 1939, appellant addressed a letter to the department of civil service protesting, in general terms, the oral interview, and, further, protesting the "use of the score of the oral interview . . . in the reckoning of the final average" for the examination. The entire protest was denied on the ground that it was not timely.

On November 21, 1939, this action was instituted.

While appellant petitioned to have himself placed in position No. 2 on the eligible list, he now, in his argument before this court, contends that he is entitled to position No. 1. We will assume that this contention may be urged at the present stage of the proceedings.

With respect to his appeal in general, appellant makes three main contentions. The first is that *four* specific questions upon the written examination, two being of the "true-false" variety, and two being of the "multiple-choice" type, were graded incorrectly. A

detailed statement of the questions will not be necessary.

Rule IV, § 11, of the rules of civil service of the city of Seattle, provides, in part, as follows:

"When final results of an examination are determined, the commission shall pass on the results thereof. If approved, the papers shall then be identified and notice of his grade shall be sent each competitor. Any competitor may inspect his examination papers within one week of the date of such notice, and if he finds material error in the marking, or in computing the final results, he may make definite written showing *to the commission.* The commission shall consider these claims and make any proper corrections." (Italics ours.)

In so far as appellant's claim of error in marking or computing final results is concerned, the record before us does not disclose that appellant ever, prior to the commencement of this action, made a "definite," or any, showing of such error before the civil service commission. This court has consistently held that, where the city charter and the rules of the civil service commission provide an orderly procedure whereby an aggrieved employee may have his complaint investigated, failure on the part of the employee to avail himself of the procedure so provided will bar review of the matter by the courts. *State ex rel. Lennon v. Kellogg,* 119 Wash. 584, 205 Pac. 843; *State ex rel. Davis v. Seattle,* 125 Wash. 660, 216 Pac. 858; *State ex rel. Hubbard v. Seattle,* 135 Wash. 505, 238 Pac. 1; *State ex rel. Abel v. Seattle,* 137 Wash. 142, 242 Pac. 9; *State ex rel. Beebe v. Seattle,* 159 Wash. 392, 293 Pac. 459.

While, for the purposes of this case, appellant may be regarded as an *applicant* for a position rather than as one already an *employee,* under the classified civil service, we are of the view that where, as in this in-

stance, the charter and civil service rules provide an orderly procedure for the consideration of complaints registered by those participating in an examination, failure on the part of a complainant to avail himself of that procedure, according to the prescribed rules, will bar review of the matter by the courts.

■ Aside from what has just been said, however, appellant's contention with respect to incorrect grading is without force for another distinct reason.

Rule IV, § 11, rules of civil service, quoted in part above, continues as follows:

"When such corrections apply to other competitors, the same shall be ordered on all papers affected, whether resulting in higher or lower average standing."

Accordingly, if the particular corrections and changes now contended for by appellant should be made as to him, they must also be made, where applicable, on the papers of all other applicants. The record, however, is silent as to how such corrections would affect the grades of others. In the absence of such information, we have, in any event, no basis upon which a change in appellant's relative standing can be determined; to change appellant's grade alone without changing the grades of the others, where necessary, would be meaningless. It follows, therefore, that appellant's first contention cannot be considered.

■ Appellant's second contention is that the civil service commission had no authority to regrade the examination papers after the identity of the contestants had been disclosed. In this connection, appellant relies upon that portion of rule IV, § 11, first above quoted, which provides that, when the final results of an examination have been determined, the commission shall pass on such results, and, upon approval thereof, the examination papers shall be identified, and notice of

his grade shall be sent to each competitor. Unquestionably, that portion of the rule implies that examination papers shall, in the first instance, be graded while they are yet unidentified. The reason for such rule is, of course, obvious. But it is equally clear, from the language which immediately follows the provision upon which appellant relies, that the rule contemplates that *corrections* in grading may be made after identification. And the rule is equally positive in statement that, when corrections apply to other competitors, *they shall be made "on all papers affected* whether resulting in higher or lower average standing."

Appellant argues that this latter provision applies merely to the correction of clerical errors, and does not permit of "a complete revision of all the markings of all the papers as was done in this examination." We do not concede that the action of the commission amounted to a "complete revision of all the markings"; but, whether it did or not, the rule provides for the correction of "material error" in the markings, and, necessarily, the "revision" must be sufficiently "complete" to correct such error wherever it applies and whomsoever it affects. Clerical errors would involve only the individual paper. The error contemplated by the rule includes such material error as may affect the entire class of competitors, and the corrections must necessarily be coextensive.

Upon this branch of the case, appellant relies upon *State ex rel. Hearty v. Mullin,* 198 Wash. 99, 87 P. (2d) 280. In that case, the relator had passed an examination in which the standard of relative weights fixed and used by the commission was as follows: "Written test, 20%; working test, 60%; and experience, 20%." The relator was notified that he had obtained a grade of 88.336% in the examination, and was placed on the eligible list with a relative standing of No. 14.

He subsequently passed the required medical examination. Two months later, the commission adopted a resolution fixing a new standard of relative weights as follows:

" 'Written test, 20%; working test, 40%; experience 40%,' and eliminated the item of education from grading experience."

The applicants were regraded according to the latter standard, with the result that the relator was lowered to a grade of 83.096%, and to the position of No. 41. Construing rule IV, § 11, above quoted, this court held that, after the first grading, and after the identity of the applicants had become known, the commission had no right "to subsequently regrade on a different basis and change the relative standing" of the relator and the other applicants. As stated in that opinion, if the commission could regrade examination papers in the manner in which it did, "civil service examinations would be subject to the whim or caprice of the commission."

The case at bar, however, presents a different situation. It does not involve the adoption of a new *standard* of grading, after the papers have been identified, but simply a correction of errors which had been found to exist in the markings, and which materially affected the grades of the applicants. Upon this distinction, and for the reasons already given, we conclude that appellant's second contention is without merit.

Appellant's final contention is that the oral examination did not comply with article XVI, § 6, of the charter of the city of Seattle, requiring civil service examinations to be *public and competitive*. His complaint in that respect is that the

" . . . oral examination or oral interview, so-called, was held behind closed doors where no one

but the competitors and the members of the examining board were permitted."

It will be recalled that, on August 10, 1939, which was six days after the oral examination, appellant wrote to the commission, requesting that he be re-examined because his grading by one of the oral examiners was affected by bias. By that request, appellant himself approved the method of the oral interview as a proper part of the examination. On September 11, 1939, which was five days after he had been notified of his corrected rating and standing, he, for the first time, protested the oral interview, as such, and the use of its score.

Rule IV, § 11, of the rules of civil service of the city of Seattle provides, in part and preliminary to what has already been quoted therefrom, as follows:

"Whenever an applicant desires to protest a part, or parts, of an examination, relating to any material included, the practicability of the examination, the scope of the tests, or any specific questions, said applicant must file such protest in writing with the commission *within three days after the holding of the examination and the commission may not consider the same unless filed within that time.*" (Italics ours.)

We have held that a rule of that character, passed in pursuance of article XVI, § 4, of the charter of the city of Seattle, is valid. *State ex rel. Strecker v. Listman,* 156 Wash. 562, 287 Pac. 663. We have also held that rules adopted and promulgated by the civil service commission, under the authority delegated to it by the city charter, have the force of law. *State ex rel. George v. Seattle,* 184 Wash. 560, 52 P. (2d) 360. And as we have already had occasion to point out, in connection with the first contention here involved, appellant's failure to avail himself of the right to protest to the civil service commission will bar a review of the question by the courts.

Whether we regard appellant's protest against the oral interview as having been made on August 10, or on September 11, 1939, in neither event was it timely, and consequently it cannot now be considered. It is therefore unnecessary to determine here whether the oral interview was, in fact and law, a public, competitive examination, and upon that question we express no opinion.

For the reasons herein given, the judgment is affirmed.

BEALS, MILLARD, ROBINSON, SIMPSON, JEFFERS, and DRIVER, JJ., concur.

BLAKE, C. J. (dissenting)—The approval of the manner in which the examination, challenged on this appeal, was conducted will defeat the primary object of civil service: the elimination of favoritism and political considerations in the selection of the employees of municipal corporations.

Admittedly, the oral examination was not publicly conducted as required by the city charter. For that reason alone, the whole examination was a nullity.

In the second place, the civil service commission violated the spirit of its own rule when it changed the grades on the examination papers after the identity of the participants was known.

In the third place, the changing of the grades was in contravention of the rule laid down in *State ex rel. Hearty v. Mullin*, 198 Wash. 99, 87 P. (2d) 280. It was there said:

"The purpose of the rule, as well as the principle underlying civil service, is to make free and open the opportunity to enter the public service in accordance with certain tests as to qualification, and not to leave anything 'to whim or caprice of the appointive power.' The commission, in this case, in regrading the papers after they had approved, as the court found, the first

grading and the identification of the applicants had become known, violated the provisions of the rule, above mentioned, as well as the principle of civil service. If the commission can do legally what it did in this case, civil service examinations would be subject to the whim or caprice of the commission.

"Attention is called to that provision in the rule which authorizes any competitor to inspect his papers and make written protest, and with reference to which the commission shall consider the protest and make any proper corrections, even though they apply to other competitors and might result in a higher or a lower average standing. Whatever the meaning of that rule may be, it cannot be given the construction which would support the action of the commission in this case. To do so, would, in effect, destroy the secrecy of the examination as to the identity of the applicants and result in a grading after the identity had become known."

It seems to me that, upon the uncontroverted facts, the civil service commission changed the *standard* by which the papers were graded after the identity of the participants was known. To begin with, the commission threw out the two following questions because they were "controversially worded":

" 'V, however, did escape and found an agreeable and welcome hideout in a house owned by T's brother, rented and occupied by W. Later on V was recaptured and W was arrested for accommodating him. It would be correct to say that W was an accessory and not a principal.'

" 'The failure of a father to supply necessary food and clothing to a minor child is a gross misdemeanor.' "

Then they held that its examiners scored the following questions as *true* when they should have scored them *false*:

" 'Arrests for misdemeanors cannot be made at night, except when the offense is committed in the presence of the arresting officer.' . . .

" 'M offers H, a witness in a court case, $10 to influence him in his testimony. M is guilty of bribery.' "

Besides that, the commission held that the following questions "were improperly scored" by its examiners:

" 'Evidence of conditions and surroundings from which the existence of a principal fact may reasonably be inferred is: 1— *prima facie* evidence; 2— circumstantial evidence; 3— parol evidence; 4—oral evidence.' . . .

" 'W, who was on bad terms with F, threw some concentrated acid in the face of F. As a result, F will lose his sight. W could be prosecuted for: 1— no crime; 2— mayhem; 3— assault; 4— assault and battery; 5— attempted murder.' . . .

" 'A, who pretends to be a friend of B, breaks into and enters the dwelling house of B in the night time with the intention of setting fire to it. A is guilty of the crime of: 1— arson; 2— robbery; 3— burglary; 4— false pretenses.' "

Effectually, the commission sat as a court of appeal to review the rulings of its own board of examiners—and that after the identity of the participants in the examination was known.

I think the questions all should have been thrown out as controversial. The examination itself and the method in which it was conducted was so palpably unfair that it should be set aside and a new examination ordered.

I dissent.

MAIN, J., concurs with BLAKE, C. J.