[No. 27975. *En Banc.* October 3, 1941.]

THE STATE OF WASHINGTON, *on the Relation of J. J. Haley, Appellant,* v. HENRY ELLIOTT *et al., Respondents.*[1]

*Ervin F. Dailey* and *Frank E. Sweeney,* for appellant.

*A. C. Van Soelen* and *John E. Sanders,* for respondents.

*Morrissey & Heney* and *A. Clemens Grady, amici curiae.*

DRIVER, J.—Relator, a police officer of the city of Seattle, sought a writ of mandate to compel the civil

[1]Reported in 117 P. (2d) 197.

service commission of that city to place him in position No. 3 on an eligible list based upon a promotional examination held on April 10, 1939, for the position of police sergeant, and to require the commission to give him the preference as to appointment over any person holding a position on the list lower than No. 2. A trial to the court on the merits resulted in the entry of a judgment quashing the alternative writ and dismissing the action. The relator appealed.

As the trial court observed, in orally announcing its decision, there was no material controversy concerning the facts. The examination in question was given in conjunction with one for the selection of detective sergeants. It had two phases: first, a written quiz and, second, a small firearms shooting test. At the same time, another promotional examination was held for the position of police captain. Some, but not all, of the questions propounded in the captaincy examination were also used in the sergeancy examinations. The identity of the participants was concealed by the customary method of assigning to each of them a number to be placed upon his examination paper.

Eighty-one persons were examined for the position of detective sergeant. Thirty-seven qualified, forty-two failed, and two were permitted to take postponed firearm tests. One hundred nineteen took the examination for the office of police sergeant. Forty-seven qualified, sixty-six failed, and six were permitted to take the postponed firearm tests. The written examination counted seventy-five per cent and the shooting tests, twenty-five per cent. A seventy per cent grade was required for qualification.

All of the police sergeancy contestants who passed the written examination took the firearm tests on July 5th and 6th, except the six previously mentioned, who were permitted to take them on July 21st and

August 3rd. On July 20th, the commission gave the appellant a written notice that his "final grade" was 88.138 per cent and his "relative standing," No. 3. On September 15th, it sent him a form letter to the effect that four "true-false" and one "multiple-choice" examination questions had been improperly scored, and three questions were found to be controversially worded and should be eliminated from consideration; that the commission had ordered the scoring revised and corrected accordingly; and that, as a result of such revision, appellant's final average had been reduced to 86.103 per cent and his relative standing to No. 17. Appellant filed timely written protests with the commission as to both the giving of the deferred firearm tests and the regrading of his examination papers.

The considerations which impelled the commission to change the scoring of some of the examination questions and to eliminate others, were stated in the testimony of its chairman as follows:

"Following the proof of the results, of the examination, notices went out, and following this, under the Rule [Rule IV, § 11] there were a number of protests made by various persons who had taken this examination. . . . I suggested that the Chief Examiner should consult with the Corporation Counsel's office, and check on these legal questions, and following that the matter was brought back to the attention of the Commission. The Chief Examiner relied upon the results of his review of these questions with the Corporation Counsel's office and the matter was heard before the Commission at a public hearing. As a matter of fact, these various protests were up for hearing on two or three occasions. . . . Any of the police sergeants,—any of the police, that we understood had made these protests, were invited to come in and give their views to the commission, in support of their protests, and after hearing all of the protests and after reviewing all of the questions about which any protest had been made or any question had been raised, the Commission took action."

Some of the protests mentioned by the witness were made by participants in the captaincy examination, while others were made by contestants for sergeancies.

Appellant advances two contentions: (1) That the civil service commission had no authority to change the grades after the identity of the competitors had been disclosed; and (2) that the commission's conduct of the firearm shooting tests was improper and in excess of its lawful authority.

The first contention is determined unfavorably to the appellant by *State ex rel. Dunn v. Elliott,* 6 Wn. (2d) 426, 107 P. (2d) 915. That case involved the captaincy examination mentioned earlier in this opinion and some of the same written examination questions under consideration here. There, the civil service commission, acting upon a number of protests filed by the contestants, concluded that six questions had been incorrectly scored and that two others were controversial and should be eliminated. The examination papers were regraded accordingly. As a result, the relative standing of appellant Dunn was lowered from No. 6 to No. 8. We held that such action on the part of the commission was authorized and proper, and did not invalidate the examination under the following provisions of Rule IV, § 11, of the civil service rules of the city of Seattle:

"When final results of an examination are determined, the commission shall pass on the results thereof. If approved, the papers shall then be identified and notice of his grade shall be sent each competitor. Any competitor may inspect his examination papers within one week of the date of such notice, and if he finds material error in the marking, or in computing the final results, he may make definite written showing to the commission. The commission shall consider these claims and make any proper corrections. *When such corrections apply to other competitors, the same shall be ordered on all papers affected, whether re-*

*sulting in higher or lower average standing."* (Italics ours.)

We distinguished *State ex rel. Hearty v. Mullin,* 198 Wash. 99, 87 P. (2d) 280 (also relied upon by appellant in the present case), by pointing out that it involved the adoption by the civil service commission of a new *standard* of grading after the identity of the competitors had been disclosed, and that it was not applicable where the commission, upon protests by contestants, had merely corrected material errors found to exist in the markings.

■ Passing now to appellant's second contention, he maintains that his grade should be raised because six of the police sergeancy competitors took the firearm tests from two to four weeks after the others had taken them, at least three of the six ultimately receiving higher grades than the appellant. These favored individuals, appellant says, were in a position to find out in advance what types of targets would be used and what the distances would be, they had time to practice, and they did not have to shoot under the same competitive conditions as the other contestants.

The record is silent as to whether, or to what extent, any of these factors actually entered into the making of the deferred tests. How, then, can we conclude, without resort to conjecture, that they materially affected the results? The tests were held at the Fort Lawton pistol range, and there is no testimony that they were in any respect extraordinary or unusual. It seems reasonable to assume that the contestants, all of whom were Seattle police officers, were familiar, at least in a general way, with the targets used and the procedure employed in shooting over a conventional army post pistol range. We may also fairly assume that such officers were trained and experienced in the

use of firearms, and that they customarily practiced more or less, especially when they were about to take a promotional examination. It is not likely, therefore, that the giving of the six contestants two or four weeks' additional time in which to practice would make any material difference. As to the dissimilarity in competitive conditions, the effect of that, too, is uncertain. Hard, keen competition is detrimental to some contestants, but serves as a stimulant and an aid to others.

The commission's chief examiner testified, and his testimony was not disputed, that the six contestants in question were permitted to take deferred shooting tests because they were "out of town" when the tests were taken by the others. Not only this testimony but also the entire record indicates that the civil service commissioners acted in good faith, for what they considered sufficient reason. The appellant has failed to show that their conduct of the shooting tests was arbitrary or capricious.

Appellant also complains that two of the contestants were allowed to take the shooting tests a second time. The record leaves their exact identity very much in doubt. It seems that one was a Mr. Gay and the other a patrolman Murphy. The junior personnel examiner testified that the latter was permitted to take the tests again because his gun backfired and injured his thumb on the first occasion. Why Mr. Gay was accorded the privilege, does not appear. However, the same witness also testified that Mr. Gay had not taken his qualifying medical examination at the time of the trial, and that, even had he done so successfully, his relative standing would have been No. 22; and that patrolman Murphy, who twice took the shooting tests, was not Charles C. Murphy, the only Murphy on the eligible list who had a higher relative standing than the appellant. Mani-

festly, appellant could not have been prejudiced by the giving of the second firearm tests to these competitors.

Judgment affirmed.

ROBINSON, C. J., STEINERT, BEALS, MILLARD, SIMPSON, and JEFFERS, JJ., concur.

BLAKE, J. (dissenting)—Upon the scoring of examination papers, *before* the identity of the aspirants was known, relator received a grade of 88.138. This grade ranked him in sixth place among those who passed the written test. He was notified of this result by the civil service commission on July 20, 1939. On September 15, 1939, *after* the identity of the aspirants became known, the civil service commission sent him the following notice:

"Re: Examinations for
    Police Sergeant
"James J. Haley
"1123 W. 65th
"Seattle, Washington
"Dear Sir:

"It has been called to our attention that, through incorrect information furnished us, the following 'true-false' statements in the recent examinations for Police Sergeant and Detective Sergeant were improperly scored:

" 'In a misdemeanor, a police officer may break open a door of a building if refused admittance while in pursuit of a criminal.'—scored as false; should be credited only when marked *true*.

" 'In criminal actions a physician can be excused from testifying against his patient on the grounds of confidential communication.'—scored as *false;* should be credited only when marked *true*.

" 'Arrests for misdemeanors cannot be made at night, except when the offense is committed in the presence of the arresting officer.'—scored as *true;* should be credited only when marked *false*.

" 'M offers H, a witness in a court case, $10 to influence him in his testimony. M is guilty of bribery.'—scored as true; should be credited only when marked *false*.

"Also, the following 'multiple-choice' question was improperly scored:

" 'Which of the following streets does not bound the Civil Auditorium? 1—Fourth Avenue North; 2—Harrison St.; 3—Republican St.; 4—Mercer St.'—No. 2 was credited as the only correct answer; but either No. 2 or No. 3 should be credited as correct.

"Also, the following questions are found to be controversially worded and should be eliminated from consideration:

" 'Persons arrested for counterfeiting may be tried by either the state or federal government.' (true-false)

" 'The failure of a father to supply necessary food and clothing to a minor child is a gross misdemeanor.' (true-false)

" 'Jones entered a building with the intention of taking certain valuable property which he believed was there, but found the building empty: 1—the crime of burglary is complete; 2—as he took nothing, he is innocent of any crime; 3—as he used no force, he has done no harm; 4—this is merely a case of trespass.' (multiple-choice)

"The Civil Service Commission, at its meeting of August 2nd, August 5th and August 23rd, 1939, ordered that the scoring of the first five questions listed above be revised to accord with correction information, and that the last three listed be eliminated from consideration for these examinations.

"As the result of such revision, your final average is 86.103, relative standing No. 17.

"Yours truly,
"SEATTLE CIVIL SERVICE COMMISSION
"Roy A. Palm
"Chief Examiner & Secretary."

If this procedure is tolerated, it will frustrate. the fundamental purpose of the merit system: the elimination of favoritism and political considerations in the selection of municipal employees. Such a procedure

was denounced in *State ex rel. Hearty v. Mullin,* 198 Wash. 99, 87 P. (2d) 280, where the court said:

"The principal question is whether the commission, after the first grading and after the identity of the applicants had become known, had the right to subsequently regrade on a different basis and change the relative standing of Hearty, as well as others. . . .

"The first and last provisions of this rule definitely show that the purpose was to have the examination conducted in such a manner that the identification of the applicants should not be known until their grades had been established, except where later parts of the examination required such identification. . . .

"The purpose of the rule, as well as the principle underlying civil service, is to make free and open the opportunity to enter the public service in accordance with certain tests as to qualification, and not to leave anything 'to whim or caprice of the appointive power.' The commission, in this case, regrading the papers after they had approved, as the court found, the first grading and the identification of the applicants had become known, violated the provisions of the rule, above mentioned, as well as the principle of civil service. If the commission can do legally what it did in this case, civil service examinations would be subject to the whim or caprice of the commission."

That the commission, in this instance, changed the *standard* or *basis* upon which the papers were graded *after* the identity of the aspirants was known, seems to me too apparent for argument. I think not only the method of grading the papers was erroneous, but also the entire examination was so palpably unfair that it should be set aside and another one ordered.

I dissent.

MAIN, J., concurs with BLAKE, J.